# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

SANDRA SHAWN,

      **Plaintiff,**

v.                                **2:09CV485**

COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Sandra Dawn Shawn ("Shawn" or "plaintiff") brought this action under 42 U.S.C. §§ 1383(c)(3) and 405(g) seeking judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. By order filed December 30, 2009, this action was referred to a United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the Court recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

On March 8, 2006, Shawn filed an application for DIB, alleging disability beginning November 6, 2003, the date she was involved in an automobile accident. (R. 92-107).[1] On November 8, 2006, Shawn filed an application for SSI, alleging disability beginning November 1,

---

[1]"R." refers to the administrative record.

2003. (R. 570-75). The Commissioner denied her application initially (R. 56, 576), and upon reconsideration, (R. 57, 577). Shawn made a timely request for an administrative hearing, (R. 54), which was conducted July 25, 2007, (R. 597-620).

On August 31, 2007, Administrative Law Judge ("ALJ") Alfred J. Costanzo found that plaintiff was not disabled within the meaning of the Social Security Act, and denied her claim for DIB and SSI. (R. 58-70). On December 5, 2008, the Appeals Council granted plaintiff's request for review of ALJ Costanzo's decision. (R. 87-90). On review, the Appeals Council vacated ALJ Costanzo's decision, and remanded the case for further proceedings. (R. 89). Specifically, the Appeals Council directed the ALJ to clarify restrictions imposed by Shawn's seizure disorder and limited tolerance for workplace stress, and the extent to which her past jobs qualified as past relevant work. (R. 89).

A second administrative hearing was conducted on March 5, 2009. (R. 621-43). On April 16, 2009, ALJ Michael J. Cummings issued an opinion also finding that plaintiff was not disabled. (R. 18-30). As directed, ALJ Cummings made additional findings concerning the impact of Shawn's seizure disorder and mental impairments, but concluded they would not preclude her past relevant work. The Appeals Council denied plaintiff's request for review of ALJ Cummings' decision on September 11, 2009, (R. 9-11), thereby making the ALJ's decision the final decision of the Commissioner.

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), on October 1, 2009, Shawn filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court for disposition of the parties' cross-motions for summary judgment.

2

## II. FACTUAL BACKGROUND

Plaintiff was born on September 27, 1965, (R. 92), and has a high school education, (R. 601). She testified that she was employed by Avis Rental Car in 1992 or 1993. (R. 606). She was also employed by Sentara from 1996 to 2000. (R. 602, 627). From 1996 to 1999, plaintiff worked as a dietary aide, which required that she deliver food trays to patients. Plaintiff stated this job required her to push carts carrying the trays, lift the food trays on and off of the carts, and clean pots and pans. Plaintiff testified that, in this job, she was on her feet all day. (R. 602). Plaintiff next worked as a nurse's care partner in 1999 and 2000, until she discovered that she had a latex allergy. (R. 603). In this job, plaintiff assisted the nurses with procedures such as taking patients' vital signs. Plaintiff also had to help move the patients. (R. 627-28). Plaintiff was trained as a phlebotomist and worked for the American Red Cross from 2000 to 2002. (R. 603). At the American Red Cross, plaintiff worked blood drives, which she stated required her to be on her feet all day and to load and unload equipment weighing, according to plaintiff's testimony, 100 pounds. Plaintiff stopped working due to her diabetes and latex allergy. (R. 603-04). Plaintiff testified that she briefly worked as an assistant to the manager at Chuck E. Cheese in October 2003; however, she quit after she was involved in an automobile accident on November 6, 2003. (R. 605).

When questioned at the hearing about the injuries sustained in the November 6, 2003 automobile accident, plaintiff testified that she suffered a concussion, seizures, neck and back injuries, and memory loss. (R. 605). She was examined at an emergency room on November 7, 2003. (R. 211-28). At that time Shawn complained of chest pain, neck pain, and right ankle pain. (R. 214). Her examination indicated she had full range of motion in all extremities, no spinal or paraspinal tenderness, and normal neurological findings. (R. 214). X-rays ordered that day revealed

3

that plaintiff had some mild degenerative changes in her posterior lumbosacral region, (R. 222); no

ankle fracture, (R. 225); and normal cervical and thoracic studies, (R. 226-27).

On March 26, 2004, plaintiff also had an MRI of her thoracic spine, which came back as

"normal" with no sign of disk herniation or cord compression. (R. 244). A March 30, 2004 MRI of

her cervical spine showed straightening and reversal of usual spinal curvature suggesting muscular

spasm and bulging discs at the C5-C6 and C6-C7 levels. (R. 243). A March 26, 2004 MRI of

plaintiff's lumbar spine showed exaggerated lordosis (increased curving) suggesting muscular and/or

ligamentous laxity, as well as central herniation of plaintiff's L5-S1 discs with slight nerve

compression, but otherwise normal with no fractures or noted problems with vertebrae or soft tissue.

(R. 245).

For some months following the automobile accident, Shawn received chiropractic treatment.

She was treated by Douglas Kaner, D.C., for a little more than three months, from November 18,

2003 to February 24, 2004, (R. 275-76), and by Robert Matturro, D.C., from February 25, 2004 to

August 4, 2004, just over five months, (R. 262-63). In a September 10, 2004 letter addressed "To

whom it may concern," Dr. Matturro opined that plaintiff had been unable to work since the date of

the automobile accident. He described her condition as severe "sprain/strain," of the cervical

thoracic and lumbar spine and suggested that cervical and lumbar disc surgery "should be

considered." (R. 261). From the statements accompanying his opinion, it appears Dr. Matturo's

only examination of the plaintiff occurred on February 24, 2004. Dr. Kaner also prepared a report of

his prior treatment stating that plaintiff's loss of bodily function as a result of the accident created

limitations and will result in pain when performing ordinary functions. Dr. Kaner's letter – dated

March 24, 2005 – was prepared more than a year after his last treatment of Shawn and directed to her attorney. (R. 273).

On August 6, 2004—two days after Dr. Matturro last treated plaintiff—orthopaedic surgeon David Rubinfield, M.D., conducted a medical examination for private insurance purposes. Dr. Rubinfield's exam, which included range of motion testing of all upper and lower extremities, was entirely normal with the exception of a left limp and the inability to toe/heel walk. (R. 246-50). Dr. Rubinfield concluded that Shawn required no further treatment for her orthopaedic injuries. He diagnosed her with status post ("s/p") cervical sprain, s/p lumbosacral sprain, s/p left knee contusion, and s/p left knee surgery. (R. 250).

Neurologist/psychiatrist Steven Lomazow, M.D., provided treatment to plaintiff from September 2004 to September 2005 for a variety of complaints, including posttraumatic headaches, and posttraumatic seizures in addition to postconcussive symptomatology. (R. 282). His initial exam revealed full motor strength, normal sensory findings, and no significant memory deficits. (R. 291). Based on Shawn's description of her symptoms, including periods where she described "being not there" as well as frequent headaches, Dr. Lomazow strongly suspected posttraumatic seizures, and assessed "weakness consistent with left-sided brain dysfunction, probable labyrinthine concussion," and significant posttraumatic migraine headaches; he prescribed Depakote, an anti-seizure medication. (R. 291-92).

A January 2005 brain MRI study was normal (R. 287), but plaintiff reported more frequent episodes of headaches and twitching in February 2005, when she was not taking her anti-seizure medication, (R. 281-82). Dr. Lomazow restarted Depakote, and plaintiff was doing well by March 2005. (R. 282, 285). In April 2005, seven months after starting treatment, plaintiff was not

5

experiencing any major headaches or episodes of passing out. (R. 282). In September 2005, plaintiff again reported episodes of "staring off into space." (R. 279). Dr. Lomazow described plaintiff's injuries as permanent and that her prognosis for a full and complete recovery is "guarded." (R. 282).

On October 3, 2006, Richard Hoffman, M.D., examined plaintiff on behalf of the Virginia Department of Rehabilitative Services—the state agency that makes disability determinations for the Commissioner. (R. 342-45). Dr. Hoffman's examination revealed some neck tenderness with mild muscle spasm, slightly reduced range of motion, and no evidence of radiculopathy or sciatica. His report describes unremarkable neurological findings, including normal knee strength and range of motion, no back spasm or tenderness, a normal gait, and no leg weakness. (R. 344). Dr. Hoffman stated that plaintiff's activity level may have some mild limitations, primarily due to the seizures and a previous knee surgery, but concluded that plaintiff "should be able to lift at least 15 - 20 pounds occasionally and at least 5 – 10 pounds frequently; [sit] for at least six hours and stand for at least two hours" in an eight-hour period. (R. 345). Dr. Hoffman opined that plaintiff should not climb above head level on ladders or scaffolds, or operate machinery due to possible seizure disorder. As a result of her prior knee problems, Dr. Hoffman speculated that plaintiff might have mild to severe difficulty with crawling or stooping but should be able to do such activities occasionally based on the tests Dr. Hoffman administered. (R. 344-45).

On November 1, 2006, state agency medical expert Francis Clark, M.D., an orthopaedist, reviewed plaintiff's medical file and found no physical evidence demonstrating the existence of a severe physical impairment. (R. 350-51). According to Dr. Clark, the medical evidence of record was based primarily on chiropractor evaluations indicating numerous restrictions that were not corroborated by the reports of the several examining medical doctors. (R. 350). Dr. Clark also cited

6

the lack of radiographic evidence supporting plaintiff's allegations, plaintiff's contradictory record statements, and the fact that several independent evaluators also questioned plaintiff's credibility.[2] (R. 350-51).

Also on November 1, 2006, state agency medical expert Anatol Oleynick, M.D., a neurologist, completed a Physical Residual Functional Capacity Assessment. (R. 352-59). Dr. Oleynick found that plaintiff had no exertional, postural, manipulative, visual, or communicative limitations, but needed to avoid working with hazards like machinery. (R. 352-56).

On April 10, 2007, state agency medical expert, Michael Cole, D.O., completed a Physical Residual Functional Capacity Assessment. (R. 377-83). Dr. Cole noted that plaintiff had a primary diagnosis of posttraumatic seizure disorder, and a secondary diagnosis of lumbar herniations and cervical disc bulge. (R. 377). Dr. Cole opined that plaintiff could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds; stand and/or walk for a total of six hours in an eight-hour workday; sit a total of six hours in an eight-hour workday; no limitations on pushing and/or pulling; could frequently balance, kneel, and crawl; occasionally stoop and crouch; and no climbing. (R. 378 -79). Like Dr. Hoffman, Dr. Cole noted that the medical evidence showed plaintiff had normal strength and sensation in all extremities, and no significant gait disturbance. (R. 383).

In September 2006, state agency expert Ace Tubbs, Jr., Ph.D., evaluated plaintiff for complaints of memory loss stemming from her 2003 automobile accident. (R. 293). During this evaluation, Shawn reported being unconscious for three days following the accident. (R. 293). She

---

[2] Clark noted in particular Shawn's statement to an examining psychologist that she had been unconscious for three days following her accident. (R. 350, 293). The medical records from the day of the accident directly contradict this statement. (R. 218-219).

described crying more often due to her divorce and losing custody of her son. (R. 293). She stated she could perform self-care and household chores. (R. 293). Dr. Tubb's examination revealed that Shawn was attentive and cooperative, with normal speech and eye contact, logical thought process, adequate insight, fair concentration and fair fund of information.

Dr. Tubb's administered tests which showed Shawn had a weak short-term memory, but adequate skills in simple calculations and vocabulary. (R. 294). He found that she had no significant memory loss that would impair functioning, and concluded that plaintiff's allegations were inconsistent with both his evaluation and history, explaining that she seemed to have recovered adequately from posttraumatic stress disorder. (R. 295). Dr. Tubbs diagnosed adjustment disorder with depressed mood, recommending an anti-depressant for the crying spells and complaints of poor sleep. He assessed plaintiff with a GAF score of 65, which corresponds to only some mild symptoms or some difficulty in social, occupational, or school functioning. (R. 295). He found no evidence of a personality disorder. (R. 296). Dr. Tubbs concluded that plaintiff had adequate ability to sustain and focus attention on tasks; could be expected to consistently perform moderately complex tasks without direct supervision; should be able to accept instruction from supervisors and interact with co-workers and the public because she was able to relate and respond in a cooperative way; and should be able to maintain regular work attendance in terms of her mood and mental abilities despite possible problems coping well with competitive work stress due to depressed mood and personal stressors. (R. 296).

On April 11, 2007, Robert Gerstle, PhD, reviewed plaintiff's medical record and completed a Psychiatric Review Technique. Dr. Gerstle also concluded that plaintiff's impairments of adjustment disorder, panic disorder, and nicotine dependence caused no restriction in her performance of daily

8

living activities; only mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 387, 389, 392, 394). He found no evidence that plaintiff could not function outside a highly supportive living arrangement. (R. 395). Dr. Gerstle explained that the evidence showed plaintiff had adequate concentration and memory and could consistently perform simple tasks in a low-stressed environment despite her difficulty dealing with stress. (R. 398). He stated that plaintiff was moderately limited in her abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a workday or work week without interruptions from psychologically-based symptoms. (R. 399-400).

In February 2007, Shawn began treatment at the Colonial Mental Health Services Board ("Colonial"). (R. 538). She received psychiatric treatment for anxiety, depression, and obsessive-compulsive disorder ("OCD") at Colonial through October 2008, primarily with Bogdan Ionescu, M.D., and DiAnn Robins, L.C.S.W. (R. 500-62). At the initial intake evaluation, on February 13, 2007, plaintiff requested a psychiatric consultation and mental health counseling. (R. 538). Plaintiff initially complained of excessive hand washing, agoraphobia, visual and auditory hallucinations, stress-induced vomiting, and stress caused by her marital divorce. (R. 504).

Dr. Ionescu evaluated plaintiff several times between February 2007 and March 2008, diagnosing adjustment disorder not otherwise specified ("NOS"), cluster B personality disorder traits, OCD, panic disorder with agoraphobia, and eating disorder NOS. (R. 444-45, 541, 544-47).

Dr. Ionescu's exams consistently showed that plaintiff was in no distress, with a euthymic mood[3] and affect, goal directed thinking, and no signs of psychosis. (R. 445, 541, 544-47). Dr. Ionescu also reported that plaintiff had intact memory functions, good concentration, and average intellect concerning her vocabulary and fund of knowledge. (R. 445). He initially assessed a GAF of 61, which corresponds to some mild symptoms. (R. 445).

On May 17, 2007, three months after he began treating plaintiff, Dr. Ionescu completed a Mental Residual Functional Capacity Assessment. At that time, he opined that, based upon his observations, plaintiff's records, and self-report, Shawn could not function on a job and that she required continued mental health treatment. (R. 448). Dr. Ionescu further opined that plaintiff had marked limitations in all categories of understanding and memory and sustained concentration and persistence, and moderate or marked limitations in all areas of social interaction and adaptation. (R. 446-47).

Three days later, on May 20, 2007, Dr. Ionescu reported that plaintiff's functional status was "consistent with improvement." (R. 547). Thereafter, on visits in July, September and December 2007, he reported that her functional status was stable with residual symptoms of anxiety and depression, and anger triggered by environmental and psychosocial stressors (R. 541, 543-46). During these visits Dr. Ionescu continually assessed Shawn as "alert", with "euthymic mood", goal directed and reality-based thinking, "and a full affect." (R. 544, 546). Plaintiff attributed her depression during these visits to psychosocial stress. (R. 546). Throughout the treatment period, the

_____

[3]Euthymic mood is a mood in the "normal" range, implying the absence of a depressed or elevated mood. Diagnostic and Statistical Manual of Mental Disorders, app. C at 825 (American Psychiatric Association, 4th ed. Text Revision 2000).

Colonial providers prescribed the anti-depressant Lexapro, the mood stabilizer Lamictal, the sleep aid Restoril, and the anti-anxiety drug Buspar. (R. 548-49, 569). Plaintiff told Dr. Ionescu that Lexapro was effective and helpful in terms of her anxiety and depression. (R. 541, 544-45).

In February 2008, plaintiff stopped receiving psychiatric counseling and was thereafter monitored by Ms. Robins, who provided counseling approximately seven times during the treatment period. Ms. Robins consistently assessed Shawn with a GAF score of 55 - 54, which corresponds to moderate symptoms. (R. 502, 518, 520, 522, 524, 526, 528, 530, 565). She noted that Shawn needed counseling to address her anxiety, depression, and OCD, along with improved coping skills. She also recommended psychiatric services for a stable mood and good functioning. (R. 529). Ms. Robins found that Shawn had anxiety and OCD symptoms, but could regularly attend to her daily activities. (R. 525, 527, 529).

Because she moved, plaintiff was discharged from Colonial on October 23, 2008. At that time, she was assessed with a GAF of 54. (R. 504-05). Ms. Robins noted that plaintiff planned to seek psychiatric services in her new area. (R. 505).

At the March 5, 2009 hearing, plaintiff testified that she had not been under the care of any physician since August 2008. Plaintiff also stopped taking her medications in August 2008 because she "had run out." (R. 630). According to plaintiff, her depression and OCD were "coming back" and she was experiencing increased panic attacks. (R. 631). Plaintiff testified that her physical maladies were "bad." (R. 632). Specifically that she was experiencing back spasms and migraines on a daily basis. Plaintiff was unsure of the last time she experienced a seizure because, she testified, she was not always aware of when they were happening. (R. 632).

11

Linda Augins was called to testify as an impartial vocational expert ("VE"). Augins testified that plaintiff's former dietary aid job involved unskilled work at the medium exertional level. (R. 634). In response to a hypothetical framed by the ALJ, Augins testified that an individual with plaintiff's RFC could perform a semi-skilled and sedentary position such as a blood bank booking clerk (15,000 locally/3.4 million nationally). Augins further testified that such an individual could perform an unskilled and light position such as rental clerk (2,800 locally/400,000 nationally). (R. 634-35). Shawn's attorney presented Augins with Dr. Ionescu's May 17, 2007 RFC assessment and asked, if the Commissioner accepted the assessment, whether Shawn could perform any work, and Augins replied she could not. In particular, Augins stated that if the Commissioner credited Dr. Ionescu's opinion that Shawn could not remember very short, simple instructions, that would preclude even unskilled work. (R. 642).

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2008); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

This Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for a period of disability and DIB under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for DIB and a period of disability, and be under a "disability" as defined in the Act.

To be eligible for SSI payments under Title XVI of the Act, the claimant, in addition to satisfying the income and resource requirements in 42 U.S.C. § 1382(a) and 42 U.S.C. § 1382(b), must also satisfy the basic eligibility and definitional requirements for disability found in 42 U.S.C. §§ 1381(a) and 1382(c).

> The Social Security Regulations define "disability" as the:
>
> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

13

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration require the Commissioner to consider all material facts in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Sbpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or combination of impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a finding of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.    The ALJ's Decision

In the present case, the ALJ made the following findings under the five-part analysis: (1) Shawn has not engaged in substantial gainful activity since November 6, 2003 (the alleged onset date of disability); (2) she has severe impairments of seizure disorder, depression, anxiety, and nicotine dependence; (3) her impairments (or combination of impairments) did not meet one of the listed impairments in Appendix 1; (4) Shawn has the RFC to perform a full range of work at all exertional levels, but with some nonexertional limitations, and is capable of performing past relevant work as a dietary aide; and (5) there are jobs that exist in significant numbers in the national economy that she can perform.  (R. 23-30).

In her motion for summary judgment, Shawn makes six separate claims: (1) The Appeals Council's decision is not in accordance with the Administrative Procedure Act ("APA"); (2) The ALJ erred at step two of the analysis by finding that the physical impairments she alleged were not severe; (3) The ALJ failed to consider all of the medical opinions in calculating plaintiff's RFC; (4) The ALJ failed to properly evaluate and assign appropriate evidentiary weight to plaintiff's treating psychiatrist, Dr. Ionescu; (5) the ALJ failed to properly analyze evidence in the record or explain the weight assigned to the evidence; and (6) the ALJ erred in determining that plaintiff could perform past relevant work as a dietary aide.  As set forth below, the Court's review of the record discloses no error in either the Appeals Council or the ALJ's evaluation of the medical source opinions or the other evidence.  As substantial evidence in the record supports his conclusion that Shawn is not disabled, the undersigned recommends that the Commissioner's decision be affirmed.

## B.    The Appeals Council's Decision Did Not Violate the Administrative Procedure Act

Shawn argues that the Appeals Council's denial of her request for review was a "decision"

subject to the APA requirement that the record include a statement of findings and conclusions. 5 U.S.C. § 557(c)(3)(A). When issuing its denial of review following the second ALJ decision on Shawn's claims, the Appeals Council simply stated that "[w]e found no reason under our rules to review the Administrative Law Judge's decision . . . In looking at your case, we considered the reasons on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decisions." (R. 9-10). The Appeals Council determined that the ALJ's holding was supported by the entirety of the record, including the additional evidence submitted by plaintiff in her request for review, and as such, properly denied her request. 20 C.F.R. § 404.970(b).

Shawn contends that the reasons given by the Appeals Council lacked the specificity required by the APA. Contrary to plaintiff's position, the Fourth Circuit has "specifically rejected the claim that the Appeals Council must 'articulate its own assessment of the additional evidence.'" Hollar v. Commissioner, 194 F.3d 1304, 1999 WL 753999, at *1 (4th Cir. 1999) (citing Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992)); see also Freeman v. Halter, 15 Fed. Appx. 87, 89 (4th Cir. 2001). The Appeals Council did not need to provide a detailed justification for its finding that plaintiff's additional evidence was insufficient to overcome the ALJ's decision to deny her benefits. Hollar, 1999 WL 753999, at *1; Freeman, 15 Fed. Appx. at 89. Accordingly, the Appeals Council's ultimate decision to deny review, and the reasons it proffered, did not violate the APA.

## C.    The ALJ properly evaluated evidence bearing on the severity of plaintiff's physical impairments

Shawn next argues that the ALJ should have found her physical impairments severe. She claims the opinions of two treating chiropractors and a neurologist who saw her following her 2003

accident establish she suffered from physical limitations affecting her ability to work. At step two of the sequential analysis, the ALJ must determine whether the plaintiff has a severe, medically determinable physical or mental impairment. 20 C.F.R. §§ 1520(a)(4)(ii) and 416.921. The regulations define a severe impairment as "any impairment or combination of impairments which significantly limits [the plaintiff's] physical or mental ability to do basic work activities . . . ." 20 C.F.R. §§ 404.1520(c) and 416.920(c). In contrast, an impairment is not severe when it is only a slight abnormality that would have no more than a minimal effect on an individual's ability to work, regardless of the individual's age, education or work experience. Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984); see 20 C.F.R. §§ 404.1521(a) and 416.921. "At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." SSR 85-28, 1985 WL 56856, at *4 (S.S.A.). (emphasis supplied). Impairments must be established by "medically acceptable chemical and laboratory diagnostic techniques," and must have lasted or be expected to last twelve months. 20 C.F.R. §§ 404.1508 and 1509.

After the second hearing, ALJ Cummings determined that Shawn has severe impairments of seizure disorder, depression, anxiety, and nicotine dependence. The ALJ determined that all of the other impairments alleged by plaintiff were not severe "because they did not exist for a continuous period of twelve months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations." (R. 24).

Shawn claims this finding is not supported by substantial evidence. Specifically, plaintiff argues that the following impairments are severe and have required ongoing treatment: cervical

17

cranial syndrome, severe cervical sprain, cervical bilateral brachial syndrome, posttraumatic muscle spasm, and disc bulge C5-7. (Pl.'s Mem. at 14). According to plaintiff, "[t]hese physical impairments existed for a continuous period of twelve months, required significant medical treatment and severely affected [plaintiff's] ability to sit, stand, walk, lift, carry, push, and pull. Thus, the ALJ should have found that [plaintiff] suffers from physical impairments which results [sic] in exertional functional limitations." Id.

In support of this claim, Shawn relies principally on excerpts from the records of her two treating chiropractors, Dr. Kaner and Dr. Matturo, who examined and treated Shawn for several months following her 2003 automobile accident. Quoting extensively from the summary letters prepared by these former treating providers, Shawn claims the evidence does not support the ALJ's finding that her physical impairments were non-severe.

Neither ALJ Costanzo nor ALJ Cummings discussed in detail Shawn's chiropractic treatment in their written opinions. Some courts have found that an ALJ's failure to analyze relevant chiropractic treatment requires remand. See Carter v. Apfel, 220 F. Supp. 2d 393, 396 (E.D. Pa. 2000) (remanding where ALJ failed to mention probative chiropractic care); Fields v. Shalala, 830 F. Supp. 284, 286 (E.D.N.C. 1993) (remanding where ALJ devoted only three paragraphs to reviewing the evidence before him). However, under the circumstances of this case, the undersigned believes the ALJ's failure to specifically discuss Shawn's chiropractic treatment was not error.

As chiropractors – not medical doctors – neither Dr. Kaner nor Dr. Matturo were "acceptable medical sources" under the Social Security Regulations. 20 C.F.R. § 404.1513. The distinction drawn by the Regulations and Rules between "acceptable medical sources" and "other sources" which may also provide medical evidence is important. Only acceptable medical sources can offer a

18

medical opinion; therefore, evidence from an acceptable medical source is required to establish a "medically determinable impairment," under step two of the sequential analysis. SSR 06-03p, 2006 WL 2329939, at *2 (.S.S.A.) (citing 20 C.F.R. § 404.1513(a) and 416.913(a)). In addition, only acceptable medical sources may be considered "treating sources" as defined in 20 C.F.R. § 404.1502. Opinions from treating sources may be entitled to controlling weight, and are therefore required to be evaluated under the SSA's detailed rules for weighing medical opinions. 20 C.F.R. §§ 404.1527(d) and 416.927(d). When the ALJ does not explicitly indicate the weight accorded medical opinions, Fourth Circuit precedent requires remand because a reviewing court is unable to determine if the ALJ's findings are supported by substantial evidence. Gordon v. Schweiker, 725 F. 2d 231, 235-36 (4th Cir. 1984).

Though the Social Security Administration has issued a policy interpretation suggesting that the factors considered when evaluating the weight to accord to the opinions of "acceptable medical sources," are also applicable to medical evidence from "other sources," the ALJ is not required to specifically enumerate the reasons why these other source opinions are accorded less than controlling weight. This follows from the express limitation that only opinions from acceptable medical sources may be considered treating source opinions. In detailing its policy interpretation concerning the weight given to other opinion evidence – including other evidence from medical sources such as chiropractors – the SSA provided the following guidance:

> Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative

value of the opinions and a weighing of all the evidence in that particular case.

Id.

In this case, ALJ Cummings summarized his opinion that Shawn's physical impairments were non-severe by concluding they "did not exist for a continuous period of 12 months, were responsive to medication, did not require any specific medical treatment, or did not result in any continuous exertional or non-exertional functional limitations." (R. 24). Shawn bore the burden of production and proof at this step of the inquiry. Pass v. Chater, 65 F.3d at 1203. However, the ALJ's conclusion on this point is not rebutted by evidence in the record from either chiropractor. Moreover, the ALJ was not required to anticipate and rebut Shawn's present argument to the contrary.

Dr. Kaner and Dr. Matturo last treated Shawn in 2004, nearly five-years prior to the second hearing on her claim of disability. The intervening medical history contains virtually no mention of the physical symptoms described by the two chiropractors. The combined period of treatment with both chiropractic providers lasted for less than nine months. (R. 262-64, 275-76). From that point forward, the medical records do not indicate that Shawn took any medication, underwent any therapy, or consulted with any other treatment provider concerning her alleged physical limitations. In her application for benefits, Shawn listed eleven current medications. None were prescribed for muscle spasm, pain relief, or the other physical symptoms described by her chiropractors. (R. 155). Moreover, after her discharge from the care of Drs. Kaner and Matturo, Shawn was examined by Dr. Rubinfield, an orthopaedic surgeon, who examined her in August, 2004 and found her condition was "completely normal." Dr. Rubinfield concluded that Shawn had fully recovered from any injury she

sustained in her November, 2003 accident and opined that she would need no further medical treatment as a result of those injuries. (R. 250).

Moreover, because neither Dr. Matturo nor Dr. Kaner are "acceptable medical sources," neither could be relied upon to establish that Shawn suffered from a "medically determinable impairment." 20 C.F.R. § 404.1513(a). Because neither could be considered a treating physician, the ALJ was not required to engage in a detailed, multifactor analysis of their opinions.

Shawn notes that a third provider, Steven M. Lomazow, M.D. a neurologist and psychiatrist, also treated her in New Jersey after the accident. As an M.D., Dr. Lomazow is an acceptable medical source, and his opinions are discussed in detail in ALJ Costanzo's opinion. However, as Dr. Lomazow's treatment summary states, his care of Shawn was limited to "post-traumatic headaches, . . . post-traumatic seizures [and] post-concussive symptomology" which the ALJ found to be severe impairments, and accommodated in his RFC assessment. (R. 282). With regard to her other physical limitations, Dr. Lomazow specifically stated that Shawn "was independently being treated for problems relating to the cervical and lumbar spine which I did not address." (R. 282).

Finally, Shawn argues that the ALJ erred by assigning "little weight" to the opinion of Dr. Hoffman, the consulting physician engaged by the Department to evaluate Shawn's claims. In both decisions, the ALJs accorded "little evidentiary weight" to Dr. Hoffman's opinion that plaintiff was limited to light exertional work. According to ALJ Costanzo, Dr. Hoffman's opinion was inconsistent with the evidence regarding plaintiff's gait. He noted that Dr. Hoffman's objective findings revealed no significant limits on her range of motion and Shawn was independent in a wide range of daily activities. (R. 69). After the second hearing, ALJ Cummings likewise found Dr. Hoffman's proposed limitations inconsistent with Dr. Hoffman's own measures of Shawn's

21

independence and his objective findings and observations concerning her physical abilities. The ALJ noted, in addition to Dr. Hoffman's unremarkable examination findings, other record evidence contradicted Dr. Hoffman's opinion that plaintiff is limited to light exertional work. (R. 27). As a medical opinion, from an "acceptable medical source," the ALJ was required to address the limited probative value assigned to Dr. Hoffman's findings, which he did.

Having discerned no error in the ALJ's review of the evidence of Shawn's physical impairments, the Commissioner's finding that those impairments were non-severe should be affirmed if it is supported by substantial evidence. There is ample medical evidence in the record to support the ALJ's findings on this point. To begin with, x-rays taken immediately after her November, 2003, accident returned essentially normal findings. (R. 222-25). Dr. Rubinfield's 2004 evaluation also concluded that Shawn would suffer no lasting injury from the accident. (R. 250). More recently, the state agency medical consultants, including Dr. Oleynick (R. 352-59) and Dr. Clark (R. 350-51), reviewed plaintiff's medical records and concluded that her physical complaints were non-severe. The ALJ was entitled to rely on the opinions of these state agency medical sources. Hays, 907 F.2d at 1456.

**D.     The ALJ accurately explained the weight assigned to medical opinions of Shawn's treating psychiatrist, and properly evaluated other evidence bearing on her RFC.**

At step four of the sequential analysis, the ALJ must determine the plaintiff's residual functional capacity (RFC), which is the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e) and 416.945(a)(1). After doing so, the ALJ uses that RFC to determine whether the claimant can perform her past relevant work. 20 C.F.R. §§ 404.1545(a)(5) and

416.945(a)(5). If not, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id.

Because the ALJ found Shawn had severe impairments, which limited her ability to work, he was required to evaluate her RFC and her ability to perform her past work. In this case, the ALJ found that Shawn has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: (1) plaintiff cannot perform tasks requiring exposure to latex products; (2) plaintiff is unable to work at unprotected heights or around dangerous machinery due to her seizure disorder; and (3) plaintiff is limited to simple, routine tasks in a low stress environment and, therefore, cannot work in production-oriented or continuous feed jobs, such as an assembly line. (R. 27). Shawn argues that the ALJ erred by not assigning controlling weight to the opinion of her treating psychiatrist, Dr. Bogdan Ionescu. She faults the ALJ's analysis of Dr. Ionescu's records and his resulting decision to afford Dr. Ionescu's opinion on her work-related limitations "little weight". (R. 28).

Dr. Ionescu began treating the plaintiff in February, 2007, and continued his treatment through February, 2008. On May 17, 2007, Dr. Ionescu prepared a Functional Capacity Evaluation in which he opined that Shawn "could not function on a job." (R. 448). The same evaluation concluded that Shawn had marked limitations in nearly all categories of understanding, memory, concentration, and persistence. (R. 446-47).

Generally, the opinion of a treating physician is accorded more weight than that of a non-examining consultant. 20 C.F.R. §416.927(d)(1). Under the federal regulations and Fourth Circuit case law, a treating physician's opinion merits "controlling weight" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] case record." Id. at §§ 416.927(d)(2) and 1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

The regulations require the ALJ to evaluate every medical opinion. Accordingly, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations.]" Id. at *5. Those factors are: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. Id. at §§ 416.927(d)(2)-(6) and 404.1527(d).

The ALJ must articulate "good reasons" for his decision as to the weight accorded to the opinion of a treating physician. 20 C.F.R. § 416.927(d)(2). Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision must contain

> specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (S.S.A.).

The ALJ afforded Dr. Ionescu's May 17, 2007, Functional Capacity Assessment little weight. He stated that Dr. Ionescu's opinion of marked limitations, and Shawn's inability to function on the job was "based largely on the claimant's own report regarding her limitations while the source's [Ionescu's] own mental examinations revealed few abnormal findings." (R. 28). He also cited Ionescu's records at Exhibits 36-F, 37-F and 39-F. (R. 409-441, 446-48). Reviewing these records, the Court agrees with the ALJ's assessment and finds no error in the weight he assigned to Dr.

24

Ionescu's Functional Capacity opinion. It bears mention that opinions - even from treating providers - that a claimant is totally disabled, or as Dr. Ionescu phrased it, "not able to function on a job" are entitled to no special deference from the ALJ. See 20 C.F.R. §§ 404.1527(e) and 416.927(e). The decision whether a claimant is disabled, or the extent to which her RFC permits her to engage in substantial gainful activity, is exclusively reserved to the Commissioner. Id.; 20 C.F.R. §§ 404.1545 and 416.946(c). Nevertheless, statements by Dr. Ionescu concerning the degree to which Shawn's mental condition limited her ability to perform work-related activities are relevant, and must be considered by the ALJ.

The exhibits cited by the ALJ confirmed his assessment of Dr. Ionescu's "few abnormal findings." During his initial interview with Shawn, he noted that her complaints were wide ranging and stated that Shawn "was likely to endorse any signs and symptoms of any psychiatric disorder." (R. 444). Just a few months before his Functional Capacity Evaluation, Dr. Ionescu examined Shawn and determined she had intact memory, good concentration, average intellect concerning her vocabulary and fund of knowledge. He assessed her with a GAF of 61, which corresponds to only mild symptoms. (R. 445). On visits after the assessment, in July, September, and December, 2007, Dr. Ionescu regularly recorded Shawn's functional status as stable, assessed her as alert with euthymic mood, goal directed and reality based thinking and a full affect. He continued her on mood stabilizers which he (and she) described as helpful for her symptoms of anxiety and depression. (R. 544-46). Shawn eventually stopped treating directly with Dr. Ionescu and began receiving services from licensed clinical social worker, Ms. DiAnn Robins. Ms. Robins saw Shawn on several occasions, and consistently assessed her GAF score between 54 and 55, which corresponds to moderate symptoms. Shawn regularly admitted to being able to attend to all activities of her daily

25

living. (R. 525, 527, 529). Given this evidentiary record cited by the ALJ, and his explanation of the reasons for according Dr. Ionescu's opinion little weight, the undersigned finds no error in his analysis of this opinion evidence.

Shawn also asserts that the ALJ erred in determining her RFC, by not crediting the opinions of her treating chiropractors, Dr. Matturro and Dr. Kaner, and her treating neurologist/psychiatrist, Dr. Lomazow. According to plaintiff, "[a]ll these physicians indicated that [plaintiff] suffers from a chronic condition which limits her ability to perform daily activities and range of motion, and that her conditions are permanent." Pl.'s Mem. at 19 (emphasis in original). As discussed in Part IV(C), chiropractors are not "acceptable medical sources" and, therefore, cannot offer medical opinions or be considered treating sources under Social Security Rules. However, in determining RFC, the ALJ is required to consider all of the evidence, including opinions from acceptable medical sources, and non-medical sources who have seen the claimant in their professional medical capacity. SSR 06-03p.

According to Shawn, the ALJ should have deferred to the findings of Drs. Matturo, Kaner and Lomazow – each of whom she characterizes as "physicians" whose treatment is "consistent throughout the record." (Pl. Mem. pp. 26-28). Because neither Dr. Kaner nor Dr. Matturo were physicians, but rather chiropractors who do not qualify as treating sources under Social Security rules, the ALJ was not required to explain in detail the weight (or lack of weight) assigned to their reports. Moreover, given that both Dr. Kaner and Dr. Matturo treated Shawn for discreet periods of less than six months, all of which ended five years prior to the hearing, the Court does not view their reports as particularly probative. The ALJ observed – correctly – that the sprains and strains described by Drs. Kaner and Matturo resolved in less than 12 months, did not require further medical

treatment, or result in continuous exertional or non-exertional functional limitations. This finding is consistent with the medical evidence and other evidence in the record and demonstrates that the ALJ considered all of the evidence in evaluating Shawn's alleged physical impairments and their impact on her RFC.

**E.    The Vocational Evidence supports the ALJ's conclusion that Shawn could perform past relevant work.**

The ALJ found that plaintiff retained the ability to perform her past relevant work as a dietary aide, as it was actually and generally performed and, therefore, was not disabled within the meaning of the Act. (R. 28). The ALJ considered the job demands in light of plaintiff's RFC and explained that the dietary aide job remained suitable because it does not involve exposure to heights, hazardous machinery, or latex, and is not performed in a high stress, production-oriented environment. (R. 28).

Shawn argues that her physical limitations prevent her from performing the requirements of her prior work as a dietary aid and that Dr. Hoffman's opinion concerning her exertional limitations establishes error in this finding by the ALJ. As set forth above, the ALJ determined to afford Dr. Hoffman's opinion, and his restrictions, little weight. That decision is supported by substantial evidence.

At the hearing, the ALJ also elicited testimony from a VE that the plaintiff's past work as a dietary aid would not ordinarily require exposure to heights, hazardous machinery or exposure to latex, and would not involve a high-stress, production-oriented environment. As a result, the ALJ's finding that the limitations imposed by Shawn's seizure disorder and latex allergy would not preclude her performing this work.

27

Absent error, the Commissioner's decision should be sustained if it is supported by substantial evidence. The ALJ did find Ms. Shawn's mental condition limited her ability to work. Although he did not find her limited to the degree of total disability, his decision on her RFC was supported by evidence in the record including the treatment records from Dr. Ionescu and Ms. Robins, and the opinion of nonexamining state agency consultant, Robert Gerstle, PhD. Dr. Gerstle reviewed Shawn's records and concluded that her impairments both only mild limitations in maintaining social functioning and moderate difficult in maintaining concentration persistence in pace with no episodes of decompensation. (R. 384-400). These limitations are accommodated in the RFC found by the ALJ and would not prevent Shawn from performing her past relevant work.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that the Commissioner's Motion for Summary Judgment be GRANTED, that the Plaintiff's Motion for Summary Judgment be DENIED and that the final decision of the Commissioner be AFFIRMED.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

28

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller DⵊM
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
August 25, 2010

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

    Gregory Edward Camden
    Montagna Klein Camden, LLP
    425 Monticello Avenue
    Norfolk, VA  23510

    Kent Pendleton Porter
    U.S. Attorney's Office
    101 W. Main Street, Suite 8000
    Norfolk, VA  23510

                         Fernando Galindo, Clerk

            By      _____
                    Deputy Clerk

                    _____, 2010