

FILED

NOV - 2 2010

CLERK, U S DISTRICT COURT
N

SANDRA SHAWN,

    **Plaintiff,**

    v.                               **Civil Action No. 2:09cv485**

COMMISSIONER OF SOCIAL SECURITY,

    **Defendant.**

## ORDER

    This case involves an appeal of a decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff Sandra Dawn Shawn ("Plaintiff") disability, disability insurance benefits, and supplemental security income benefits under the Social Security Act. It comes before the Court upon the Report and Recommendation ("Magistrate's Report") of Magistrate Judge Douglas E. Miller regarding cross-motions for summary judgment. Judge Miller recommended that the Commissioner's denial of benefits be affirmed.

    Plaintiff objects to the Magistrate's Report, and argues that the Magistrate Judge Miller erred in finding that the ALJ's opinion was supported by substantial evidence. Specifically, Plaintiff argues that Judge Miller committed error by (i) finding that the ALJ's opinion was supported by substantial evidence despite the ALJ's failure to discuss medical evidence from Plaintiff's chiropractors and (ii) failing to address Plaintiff's argument that the ALJ erroneously glossed over the opinion of Plaintiff's neurologist/psychiatrist, Dr. Lomazow. For the reasons

explained below, the Court **DENIES** the Plaintiff's Objections to the Report and Recommendation of the Magistrate Judge, **ADOPTS** the Magistrate Judge's Report and Recommendation, and incorporates the Magistrate Judge's Report & Recommendation by reference. Thus, the final decision of the Commissioner is hereby **AFFIRMED**.

## I.   FACTUAL BACKGROUND

Plaintiff was born on September 27, 1965. (R. 92.) She has a high school education. (R. 601.) Her relevant work experience includes employment as a dietary aide, a nurse's care partner, and a phlebotomist.[1] (R. 602–07.) Plaintiff's most recent employment was in October 2003, when she worked as an assistant manager at Chuck E. Cheese. (R. 605.) Plaintiff quit this job due to an automobile accident that occurred on November 6, 2003. (Id.) She alleges that she suffered a concussion, seizures, neck and back injuries, and memory loss as a result of this accident, and is therefore unable to work. (Id.; R. 122.)

The accident in question occurred when Plaintiff was riding home from work on the night of November 6, 2003. (Id.) Plaintiff states that "it was storming that night and we were up on the interstate up in Jersey and a dog ran out in front and my, the driver of the car hydroplaned and we went into the barrier walls on the interstate." (Id.) She was taken by ambulance to St. John's Hospital and Medical Center. (R. 212.) Emergency room records indicate that Plaintiff complained of loss of consciousness and pain in her neck, chest, right ankle, and left knee. (R. 214–16.) An examination found that she had full range of motion in all of her extremities, no spinal or paraspinal tenderness, and normal neuroogical findings. (R. 214.) Radiological studies

---

[1]A phlebotomist is an individual who draws blood from patients or donors in a hospital, blood bank, or similar facility.

taken that day revealed only mild degenerative changes in her posterior lumbosacral region, no ankle fracture, and normal cervical and thoracic studies. (R. 222--27.) Hospital records from November 7, 2003, indicate that she was treated as an "outpatient" and she was not admitted to the hospital but released. (R. 211.)

On November 12, 2003, Plaintiff went to an opthamologist with complaints of blurry vision and irritation around her eye. (R. 229.) On November 26, 2003, she was clinically examined and diagnosed with an orbital fracture. (R. 230.) Plaintiff reported to the Neuroscience Center of Northern New Jersey on December 5, 2003 for further treatment. According to clinical notes from the Neuroscience Center, Plaintiff stated at the time that she was "uncertain whether there was any loss of consciousness [after her accident], but she has amnesia for the actual accident." (R. 234.) She complained of problems with concentration, "persistent headaches, dizziness and fatigue since the accident." (Id.) The examining physician concluded that "her symptoms are most likely post-concusive," and ordered a set of CT scans.

The CT scans taken on December 11, 2003 found "no evidence of [an orbital] fracture." (R. 232.) Notably, the reviewing radiologist also found the CT scan of Plaintiff's head to be an "[u]nremarkable examination," with "no abnormal areas of increased or decreased attenuation . . . within the brain." (R. 231.)

Plaintiff received chiropractic treatment for approximately eight months following the automobile accident. She was first treated by Douglas Kaner, D.C., from November 18, 2003 to February 24, 2004. (R. 275–76.) Dr. Kaner described his treatment of Plaintiff in a report dated March 24, 2005. In this report—which is addressed to Plaintiff's attorney—Dr. Kaner stated that Plaintiff had lost bodily function as a result of the accident and would experience pain while

3

performing ordinary bodily functions. (R. 268–272.) According to Dr. Kaner's report, x-rays were performed at the time of Plaintiff's initial office visit on November 17, 2003. These x-rays revealed "physical evidence of a traumatic insult to the cervical, thoracic, and lumbar ligaments along with vertebral offsets and multiple levels of altered spinal biomechanical interpretations." (R. 268–269.) This is an unusual finding concerning tissue which normal x-rays do not reveal.

Later, from February 25, 2004 until August 4, 2004, Plaintiff received treatment from Robert Matturro, D.C. In a letter dated September 10, 2004 and addressed "[t]o whom it may concern," Dr. Matturo opined that Plaintiff had been unable to work since the date of her automobile accident. Dr. Matturro described her condition as severe "sprain/strain" of the cervical thoracic and lumbar spine and stated that cervical and lumbar disc surgery "should be considered." (R. 261.) Judging from billing history accompanying this opinion, it appears that Dr. Matturo only examined the Plaintiff on one occasion---on February 25, 2004. (R. 263–64.)

On March 26, 2004, Plaintiff had MRIs taken of her thoracic spine and her lumbar spine. (R. 244–45.) This would show any ligament problems. The thoracic spine MRI came back "normal" with no sign of disk herniation or cord compression. (Id.) The lumbar spine MRI, however, showed exaggaerated lordosis (increased curvature) suggesting muscular and/or ligamentous laxity, as well as central herniation of plaintiff's L5-S1 discs with slight nerve compression. (Id.) Aside from these issues, the lumber spine MRI was otherwise normal. A subsequent cervical spine MRI on March 30, 2004 showed a straightening and reversal of usual spinal curvature, suggesting muscular spasm and bulging discs at the C5-C6 and C6-C7 levels. (R. 243.)

4

Despite Dr. Matturo's recommendation, Plaintiff received no further treatment for her physical ailments and did not elect to undergo surgery. On August 6, 2004, orthopaedic surgeon David Rubinfield, M.D., medically examined Plaintiff for private insurance purposes. Dr. Rubinfield's exam, which included range of motion testing of all upper and lower extremeties, was entirely normal except for a left limp and an inability to toe/heel walk. (R. 246–50.) Dr. Rubinfield diagnosed Plaintiff with status post ("s/p") cervical sprain, s/p lumbosacral sprain, s/p left knee contusion, and s/p left knee surgery. (R. 250.) Dr. Rubinfield did not recommend any further treatment. (Id.)

Although she received no further treatment for her physical injuries after leaving Dr. Matturo's care, Plaintiff did obtain psychiatric treatment. On August 12, 2004, Plaintiff was evaluated by David Pilchman, Ph.D. Dr. Pilchman described Plaintiff as "overweight, casually dressed, and well groomed." (R. 253.) He noted that although she complained of having diabetes, she was "eating Cheetos while sitting in the waiting room prior to her morning appointment." (Id.) Dr. Pilchman administered a Beck Anxiety Inventory and a Beck Depression Scale." (R. 254.) Plaintiff reported "moderate depressive symptoms" on the Depression Scale, and moderate to severe anxiety on the Anxiety Inventory. (Id.) Dr. Pilchman assigned Plaintiff a GAF score of 59—which corresponds to a moderate symptoms—and recommended further psychiatric treatment.

Neurologist/psychiatrist Steven Lomazow, M.D., provided treatment to Plaintiff from September 2004 to September 2005 for a variety of ailments, including posttraumatic headaches, posttraumatic seizures, and postconcussive symptomatology. (R. 282.) Dr. Lomazow's initial exam revealed full motor strength, normal sensory findings, and no significant memory deficits.

5

(R. 290–92.) Based on Plaintiff's self-described symptoms—which included periods in which she described "being not there" as well as frequent headaches—Dr. Lomazow strongly suspected posttraumatic seizures, and assessed "weakness consistent with left-sided brain dsyfunction, probable labyrinthine concussion," and significant posttraumatic migraine headaches. (R. 289–92.) He prescribed Depakote, an anti-seizure medication. (R. 292.)

Despite a normal brain MRI study in January 2005, Plaintiff reported that the frequency of her headaches and twitching increased when she stopped taking Depakote in February 2005. Dr. Lomazow restarted Plaintiff on Depakote, and Plaintiff was doing well by March 2005. (R. 282, 285.) By April 2005, Plaintiff was not experiencing any major headaches or episodes of passing out. (R. 282.) In September 2005, however, Plaintiff again reported episodes of "staring off into space." (R. 279.) Dr. Lomazow described Plaintiff's injures as permanents and gave her a "guarded" progrnosis for a full and complete recovery. (R. 282.)

In September 2006, Ace Tubbs, Jr., Ph.D., evaluated Plaintiff's claims of memory loss on behalf of the Virginia Department of Rehabilitative Services.[2] (R. 293.) During this evaluation, Plaintiff reported being unconscious for three days following the accident, which seems entirely inconsistent with the emergency room records. (Id.; R. 211.) She also described crying more often due to her divorce and losing custody of her son. (R. 293) She stated that she could perform self-care and household chores. (Id.) Dr. Tubbs reported that Plaintiff was attentive and cooperative, had normal speech and eye contact, logical thought process, adequate insight, fair concentration and a fair fund of information.

---

[2] The Virginia Department of Rehabilitative Services makes disability determinations for the Commissioner.

Dr. Tubbs administered a series of psychological tests to Plaintiff. The results showed that Plaintiff had average to low-average memory skills. (R. 295.) Dr. Tubbs found that Plaintiff had no "significant memory loss which causes impaired functioning." (Id.) He also found that Plaintiff's "allegations are inconsistent with my observations and history." (Id.) Dr. Tubbs diagnosed Plaintiff with adjustment disorder with depressed mood, and recommended an anti-depressant to "help with crying episodes and problems with sleep onset as well as moderate the impact of pain." (Id.) He gave Plaintiff a GAF score of 65, which corresponds to mild symptoms or some difficulty in occupational functioning. (Id.) In his summary, Dr. Tubbs stated that Plaintiff could adequately complete activities of daily living that are not limited by pain; could deal with her PTSD problems relating to motor vehicles; and could perform moderately complex tasks on a consistent basis without direct supervision. (R. 296.)

On October 3, 2006, Richard Hoffman, M.D., conducted a physical examination of Plaintiff on behalf of the Virginia Department of Rehabilitative Services. Dr. Hoffman's examination revealed some neck tenderness with mild muscle spasm, slightly reduced range of motion, and no evidence of radiculopathy or sciatica. (R. 344.) His report describes unremarkable neurological findings, including normal knee strength and range of motion, no back spasm or tenderness, a normal gait, and no leg weakness. (Id.) Dr. Hoffman stated that Plaintiff's activity level might have some mild limitations, primarily due to the seizures and a previous knee surgery. Nevertheless, Dr. Hoffman concluded that Plaintiff "should be able to lift at least 15–20 pounds occasionally and at least 5–10 pounds frequently'; [sit] for at least six hours and stand for at least two hours" in an eight-hour period. (R. 345.) Dr. Hoffman opined

7

that Plaintiff should not climb above head level on ladders or scaffolds, operate machinery, or crawl and stoop more than occasionally.

On November 1, 2006, state agency medical expert Francis Clark, M.D., reviewed Plaintiff's medical file. Dr. Clark found no physical evidence demonstrating the existence of a severe physical impairment. (R. 350–51.) According to Dr. Clark, the medical evidence of impairment was based primarily on chiropractic evaluations, which were contradicted by the reports of several examining medical doctors and unsupported by any radiographic evidence. (Id.) Dr. Clark also noted certain inconsistencies in Plaintiff's statements, including the statement she made to Dr. Tubbs about being unconscious for three days following her automobile accident. (R. 293, 350–51.)

Also on November 1, 2006, state agency expert Anatol Oleynick, M.D., completed a Physical Residual Functional Capacity Assessment. (R. 352–59.) Dr. Oleynick found that Plaintiff had no exertional, postural, manipulative, visual, or communicative limitations. (R. 352–56.) Dr. Oleynick joined with Dr. Hoffman, however, in recommending that Plaintiff avoid working with hazards such as machinery. (R. 356.)

On April 10, 2007, state agency expert Michael Cole, D.O., completed a second Physical Residual Functional Capacity Assessment. (R. 377–83.) Dr. Cole listed Plaintiff's primary diagnosis as Posttraumatic Seizure Disorder and her secondary diagnosis as lumbar herniations and cervical disc bulge. (R. 377.) Based on a review of Plaintiff's medical records, Dr. Cole opined that Plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit, stand and/or walk for a total of six hours in an eight-hour workday; frequently balance, kneel, and crawl; and occasionally stoop and crouch. (R. 378–89.) Like Dr. Hoffman,

Dr. Cole noted that Plaintiff had normal strength and sensation in all extremities and no significant gait disturbance. (R. 383.)

On the next day, April 11, 2007, Robert Gerstle, PhD, reviewed Plaintiff's medical records and completed a Mental Residual Functional Capacity Assessment. Dr. Gerstle concurred with Dr. Tubbs' finding that Plaintiff could adequately perform daily living activities, as well as his finding that Plaintiff had only mild difficulties in social function. (R. 387, 389, 392, 394.) He found no evidence of an inability to function outside a highly supportive living arrangement. (R. 395.) In his conclusion, Dr. Gerstle found that Plaintiff "should be able to perform simple tasks on a consistent basis in a low stressed [sic] environment." (R. 398.) Dr. Gerstle did find, however, that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 399.) He also found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended period, and in her ability to complete a workday without interruption from psychologically-based symptoms. (R. 399–400.)

Between February 12, 2007 and October 23, 2008, Plaintiff received treatment at the Colonial Mental Health Services Board ("Colonial"). (R. 500–69.) Plaintiff was treated for anxiety, depression, and obsessive-compulsive disorder. Her primary caregivers at Colonial were Bogdan Ionescu, M.D., and DiAnn Robins, L.C.S.W. (R. 500–62.) At her initial intake interview, Plaintiff complained of symptoms of excessive hand washing, checking locks and doors, agoraphobia, visual and auditory hallucinations, and panic attacks. Plaintiff also claimed to suffer from stress-induced vomiting, and stated that a recent divorce was a primary stressor. (R. 501.)

Dr. Ionescu treated Plaintiff several times between February 13, 2007 and March 20, 2008. On February 27, 2007, Dr. Ionescu diagnosed Plaintiff with adjustment disorder not otherwise specified ("NOS"), cluster B personality disorder traits, obsessive-compulsive disorder, panic disorder with agoraphobia, and eating disorder NOS. (R. 444–45.) On May 17, 2007, Dr. Ionescu completed a Mental Residual Functional Capacity Assessment. (R. 409–415.) In contrast to Dr. Gerstle, Dr. Ionescu found that Plaintiff could not function on a job and that she required continued mental health threatment. (R. 414.) Dr. Ionescu also noted problems with concentration, task completion, and poor social skills. (Id.)

Three days later, on May 20, 2007, Dr. Ionescu reported that Plaintiff's functional status had improved. (R. 547.) On subsequent visits in July, September, and December of 2007, Dr. Ionescu reported that Plaintiff's functional status was stable with residual symptoms of depression, anxiety, and anger triggered by environmental and psychosocial stressors. (R. 541, 543–46.) During these visits, Dr. Ionescu consistently described Plaintiff as "alert," with "euthymic mood," and with a "full affect." (R. 541, 544, 546.) Plaintiff attributed her ongoing depression to psychosocial stress. (R. 546.) Plaintiff reported that the anti-depressant Lexapro worked well in controlling her anxiety and depression. (R. 541, 544–45.)

In February 2008, Plaintiff stopped receiving psychiatric counseling, and was thereafter monitored by Ms. Robins. Ms. Robins provided counseling approximately seven times between February and October of 2008. Ms. Robins consistently assessed Plaintiff with a GAF score of 55-54, corresponding with moderate symptoms. (R. 502, 518, 520, 522, 524, 526, 528, 530, 565.) Ms. Robins noted that Plaintiff required counseling to address her anxiety, depression, and OCD, along with improved coping skills. She also recommended further psychiatric treatment

10

for mood stabilization and to improve Plaintiff's functioning. (R. 529.) Ms. Robins found that Plaintiff had anxiety and OCD symptoms, but could regularly attend to her daily activities. (R. 525, 528, 529.)

Because she moved from Williamsburg to Newport News, Plaintiff was discharged from Colonial on October 23, 2008. At the time of her discharge, Ms. Robins assessed her with a GAF score of 54. (R. 504–05.) According to Ms. Robins, Plaintiff indicated that she would be seeking out psychiatric services in Newport News. (R. 505.)

At a March 5, 2009 hearing before Administrative Law Judge Michael Cummings, Plaintiff stated that she did not obtain further psychiatric treatment after leaving Colonial, and she stopped taking her medication in August 2008 because she had "run out." (R. 630.) According to Plaintiff, her depression and OCD were "coming back" and she was experiencing increased panic attacks. (R. 631.) At the hearing, Plaintiff also complained of "bad" physical maladies including daily migraines and back spasms. Plaintiff stated that she continued to have seizures, although she could not recall the last time she had had one. (R. 632.)

## II.   PROCEDURAL BACKGROUND

Plaintiff filed an Application for Disability Insurance Benefits on April 11, 2006. In the application, Plaintiff indicated that her disability began on November 6, 2003. (R. 92.) Plaintiff alleged that she was unable to work due to a variety of illnesses and conditions, including "cervical cranial syndrome," memory loss, allergies, "severe cerivical [sic] strain/sprain," headaches, seizures, and depression. (R. 122.)

After reviewing Plaintiff's application and her medical records, the Social Security Administration denied Plaintiff's application on November 20, 2006. (R. 71–74.) On May 11,

2007, Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (R. 54.) The hearing was scheduled for July 25, 2007. (R. 41.)

On July 25, 2007, Plaintiff appeared with counsel for a hearing before ALJ Alfred Costanzo. (R. 599–620.) Plaintiff testified to her past employment history, her car accident, and her medical history and condition. (Id.) ALJ Costanzo also heard testimony from impartial vocational expert Linda Augins, who classified Plaintiff's prior work experience. (R. 617–20.)

On August 31, 2007, ALJ Costanzo issued a decision in which he determined that Plaintiff was capable of performing past relevant work, and thus was not entitled to SSI, DIB, or disability. (R. 61–70.) More specifically, ALJ Costanzo found that Plaintiff suffered from sizure disorder, adjustment disorder, personality disorder, anxiety disorder, obsessive compulsive disorder, and bipolar disorder. (R. 64.) He also found that Plaintiff was precluded from working at unprotected heights or performing skilled work. (R. 65.) However, ALJ Costanzo concluded that Plaintiff was capable of performing past relevant work as a blood taker, cashier, clerk, fountain worker, and dietary aid. (R. 69.) ALJ Costanzo did not specifically discuss the evidence from Dr. Matturo and Dr. Kaner.

On September 10, 2007, Plaintiff requested review of ALJ Costanzo's decision by the Appeals Council of the Office of Hearings and Administration ("Appeals Council"). (R. 82–84.) On December 5, 2008, the Appeals Council vacated ALJ Costanzo's decision and remanded the case for further proceedings. (R. 88–90.) The Appeals Council found that ALJ Costanzo erred in failing to specifically consider "how any stress intolerances established by the evidence affects her ability to engage in work activities." (Id.) The Appeals Council also remanded for further analysis of Plaintiff's relevant work experience. (Id.)

A second ALJ hearing was conducted on March 5, 2009 before ALJ Michael Cummings. Plaintiff appeared with counsel and gave testimony concerning her prior work experience. (R. 623–633.) Plaintiff also testified about her medical condition and the medical treatment she had received since 2007. (Id.) Ms. Augins, the vocational expert who had testified at the previous hearing before ALJ Costanzo, also gave testimony at the hearing, and testified about Plaintiff's capacity to perform work as a phlebotomist, rental clerk, and blood bank booking clerk. (R. 634–642.)

ALJ Cummings issued an opinion on April 16, 2009, in which he determined that Plaintiff was capable of performing past relevant work as a dietary aide, and thus was not entitled to SSI, DIB, or disability. (R. 21–30.) ALJ Cummings found that the medical record of evidence reflected diagnoses of seizure disorder, depression, anxiety, and nicotine dependence. (R. 23.) He further found, however, that Plaintiff

> has the residual functional capacity to perform a full range of work at all exertional levels, but with the following nonexertional limitations: she cannot perform tasks requiring exposure to latex products; she is unable to work at unprotected heights or around dangerous machinery due to seizures; and she is limited to simple routine tasks in a law stres environment and therefore cannot work in production-oriented or continuous feed jobs, such as an assembly line.

(R. 27.)

ALJ Cummings gave "little evidentiary weight" to Dr. Hoffman's opinion, finding this opinion to be "inconsistent with his own observations regarding the claimant's gait and functioning, as well as the objective findings, and . . . inconsistent with the claimant's reported independence in daily activities." (Id.) Because Dr. Cole based his opinion in large part on Dr. Hoffman's findings, ALJ Cummings gave Dr. Cole's opinion little weight as well. (R. 28.)

Similarly, ALJ Cummings gave little weight to the opinion of Dr. Ionsecu, "because his findings of marked limitations in several areas and inability to function on the job was based largely on the claimant's own report regarding her limitations, while the source's own mental examinations revealed few abnormal findings." (Id.) Like ALJ Costanzo, ALJ Cummings did not specifically mention the records from Dr. Kaner or Dr. Matturo.

On April 20, 2009, Plaintiff filed a request for a review of ALJ Cumming's opinion by the Appeals Council. (R. 16–17.) On September 11, 2009, the Appeals Council affirmed the ALJ's decision and denied her request for review. (R. 9.)

On October 1, 2009, Plaintiff brought this action seeking judicial review of the Commissioner's decision to deny her claim for DIB under 42 U.S.C. § 405(g) and 5 U.S.C. § 706. Defendant filed an Answer on December 23, 2009, and this action was referred to Magistrate Judge Douglas E. Miller. Plaintiff filed a motion for summary judgment with a memorandum in support, and Defendant filed a motion for summary judgment with a memorandum in support and in opposition to Plaintiff's motion for summary judgment. Plaintiff did not file a response to Defendant's motion for summary judgment, and filed a Reply in support of her own motion for summary judgment.

In her motion for summary judgment, Plaintiff raised a number of objections to ALJ Cummings' decision. In relevant part, Plaintiff argued that "[t]he ALJ failed to find that Ms. Shawn suffers from severe physical impairments of cervical cranial syndrome, severe cervical sprain, cervical bilateral brachial syndrome, post traumatic muscle spasm, and disc bulge C5-7." (Mem. in Supp. Mot. Sum. J. 16.) In support of this argument, Plaintiff referred to the medical records of her chiropractors—Dr. Kaner and Dr. Matturro—as well as the records of Dr.

14

Hoffman and Dr. Lomazow. Plaintiff also argued that the ALJ "did not address the medical opinions of Ms. Shawn's well established treating physicians, Dr. Robert Matturro, Dr. Douglas Kaner, and Dr. Steven Lomazow." (Id. at 21.)

On August 25, 2010, Judge Miller filed an extensive Report and Recommendation recommending that the final decision of the Commissioner be affirmed. Judge Miller found "no error in the ALJ's review of the evidence of Shawn's physical impairments . . . ." (R & R 22.) Judge Miller further found that there was "ample medical evidence in the record to support the ALJ's findings on this point." (R & R 22.)

## III.    STANDARD OF REVIEW

On an appeal of the final decision of the Commissioner, the Court must uphold the Commissioner's decision if, based upon the entire administrative record, the decision is supported by substantial evidence. 42 U.S.C. § 405(g). See also Ridings v. Apel, 76 F. Supp. 2d 707, 708 (W.D. Va. 1999) (noting that the court "must uphold the factual findings and final decision of the Commissioner if they are supported by substantial evidence"); Winford v. Chater, 917 F. Supp. 398, 400 (E.D. Va. 1996) (stating that "when a social security claimant appeals a final decision of the Commissioner, the district court must determine whether, based on the entire administrative record, the Commissioner's decision is supported by substantial evidence"). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Where conflicting evidence allows reasonable minds to differ as to whether the claimant is disabled, the responsibility for that decision falls on the Commissioner (or on the Commissioner's designate, the ALJ)." Craig, 76 F.3d at 589. Only if no reasonable mind could accept the record as adequate to support the determination will the denial of benefits be reversed. Richardson v. Perales, 402 U.S. 389, 401 (1971).

The magistrate judge only makes a recommendation to the Court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the Court. Owens ex rel. Metcalf v. Barnhart, 444 F.Supp.2d 485, 488 (D.S.C. 2006) (citing Matthews v. Weber, 423 U.S. 261, 269 (1976). Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), a party objecting to a magistrate's report and recommendation may serve and file specific written objections to the proposed findings and recommendations. Upon the filing of specific written objections to a Magistrate Judge's Report and Recommendation, the Court is required to review de novo those portions of the report to which objections are made. 28 U.S.C. § 636(b)(1) (stating that "a judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made"); see also Winford, 917 F. Supp. at 399-400 (noting that if a party files written objections to a magistrate judge's report and recommendation, the district court is required to make de novo determinations of the report to which the objection is made).

## IV.   ANALYSIS

Plaintiff argues that the Magistrate Judge erred in two respects. First, Plaintiff objects to the Magistrate Judge's finding that the ALJ's opinion was supported by substantial evidence because the ALJ did not discuss the opinion of the Plaintiff's chiropractors. Second, plaintiff argues that the Magistrate Judge failed to address Plaintiff's argument that the ALJ erroneously glossed over the opinion of Plaintiff's neurologist/psychiatrist, Dr. Lomazow. The Court will address each argument in turn.

### 1.   *Chiropractic Evidence*

Plaintiff argues that "the ALJ failed to analyze and consider probative exhibits in the record, specifically the opinions of Ms. Shawn's chiropractors Dr. Kaner and Dr. Matturo." (Pl.'s Br. 3.) Plaintiff claims that the "medical treatments rendered by Dr. Kaner and Dr. Matturo are extremely relevant to ascertain the severity of Ms. Shawn's physical impairments," and that the ALJ erred in failing to specifically discuss their medical records. (Id. at 5.) In support of this argument, Plaintiff cites three cases in which a district court ordered remand for further consideration of chiropractic evidence. (Id. (citing Carter v. Apfel, 220 F. Supp. 2d 393, 396 (E.D. Pa. 2000); Fields v. Shalala, 830 F. Supp. 284, 286 (E.D.N.C. 1993); Schonewolf v. Callahan, 972 F. Supp. 277, 286 (D.N.J. 1997)).

Defendant argues that "under the circumstances of this case," the failure to address these records was not error. (Def.'s Br. 2.) Defendant notes that x-rays taken after Plaintiff's accident "returned essentially normal findings," that Dr. Kaner and Dr. Matturo only treated Plaintiff for a combined period of approximately nine months, and that subsequent medical records contain "virtually no mention of the physical symptoms described by the two chiropractors." (R & R 20,

22.) Finally, Defendant notes that an orthopaedic surgeon, Dr. Rubinfield, examined Plaintiff and found her physical condition to be "completely normal." (Def.'s Br. 2.) For these reasons, Defendant argues that ALJ Cummings did not err in failing to provide a "detailed discussion of the opinions of plaintiff's chiropractors . . . ." (Id.)

The Social Security Administration draws a distinction between "acceptable medical sources" and "other sources." See 20 C.F.R. §404.1527(a)(2); Social Security Ruling 96-8p. Acceptable medical sources include licensed physicians, licensed or certified psychologists, and licensed podiatrists and optometrists. 20 C.F.R. §404.1513(a). The distinction between acceptable medical sources and other sources is relevant in two respects. First, "evidence from an acceptable medical source is required to establish a 'medically determinable impairment' . . . ." (R & R. 19.)" See 20 C.F.R. §§404.1508, 1509; Wright v. Apfel, 172 F.3d 46, at *3 (4th Cir. 1998) (per curiam) ("Dr. Henderson's opinion, as a chiropractor, cannot serve as medical evidence."). Second, an ALJ may—but need not—expressly discuss evidence from a source that is not an acceptable medical source. This latter distinction is embodied in a policy interpretation from the Social Security Administration, SSR 06-03P.

SSR 06-03p explains how an ALJ should consider opinions from sources who are not "acceptable medical sources." In relevant part, it provides as follows:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant

or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p.

The Magistrate Judge noted that "[a]s chiropractors—not medical doctors—neither Dr. Kaner nor Dr. Matturo were 'acceptable medical sources' under the Social Security Regulations." (R & R 18.) Plaintiff does not contest this point, but instead argues that the ALJ erred in failing to explicitly discuss their treatment records. A similar argument was raised and rejected in a recent opinion from this district, Smith v. Commissioner of Social Security, No. 4:09cv80, 2010 WL 1640271 (E.D. Va. April 22, 2010). In Smith, a claimant argued that an ALJ erred by failing to discuss evidence from a licensed professional counselor, Ms. Pugh. Judge Morgan rejected this argument, stating as follows:

> While an ALJ is required to consider all of the relevant evidence in the record, there is no requirement that the ALJ expressly discuss each piece of that evidence. See S.S.R. 06-3p (recognizing "a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision"). Indeed, such a requirement, if it existed, would impose an insuperable burden on the adjudicatory system of the Social Security Administration. The mere fact that the ALJ did not discuss one, several, or even many treatment records cannot therefore justify the conclusion that the ALJ did not consider those records. To the contrary, the ALJ did discuss some of Ms. Pugh's treatment records, which suggests that he had those records before him and that he considered all of them as required by federal regulation. Furthermore, as explained previously, the use of Ms. Pugh's opinion by the ALJ in reaching his decision was permissive rather than mandatory, because her opinion does not fall within the regulatory definition of a medical opinion. 20 C.F.R. § 404.1513(a), (d). Thus, Plaintiff provides no persuasive reason to believe that the ALJ did not evaluate and analyze the evidence pursuant to the applicable regulatory provisions of the Social Security Act. This is true even though Plaintiff points to evidence in the record that could have been used in support of an alternate outcome; conflicting evidence undoubtedly exists in every dispute over a claimant's eligibility to receive SSI, but it is not the Court's job to reweigh such evidence when reviewing an ALJ's decision.

Smith, 2010 WL 1640271 at *3.

The Court finds Smith to be persuasive, and adopts the reasoning set forth therein. The mere fact that ALJ Cummings did not discuss the records from Plaintiff's chiropractors does not justify the conclusion that ALJ Cummings did not consider those records. See Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir.1996) (stating that while an ALJ must consider all of the evidence in the record, nothing requires the discussion of every piece of evidence); Kornecky v. Commissioner, 167 Fed. App'x 496, 508 (10th Cir. 2006) (per curiam) (unpub.) ("[I]t is well settled that '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting Loral Defense Systems-Akron v. N.L.R.B., 200 F.3d 436, 453 (6th Cir.1999)). Indeed, ALJ Cummings stated that he "considered opinion evidence in accordance with the requirements of . . . SSR[] 06-3p." (R. 25.) As in Smith, the inclusion of this evidence in ALJ Cummings' written opinion was permissive, not mandatory. See SSR 06-03p; see also Shears v. Commissioner, No. 1:09-cv-1011, 2010 WL 3385518 (W.D. Mich. Aug. 2, 2010) ("SSR 06-3p does not require that an ALJ discuss opinions supplied by 'other sources' and explain the evidentiary weight assigned thereto."). Accordingly, ALJ Cummings committed no error by failing to specifically address the evidence from Plaintiff's chiropractors.

The Court finds ALJ Cummings' opinion to be supported by substantial evidence. Radiological studies taken immediately after Plaintiff's car accident showed no evidence of traumatic injury to Plaintiff's back or spine. (R. 222-27.) Plaintiff was not hospitalized or given inpatient treatment. (R. 211.) Subsequent MRIs taken in March 2004 revealed no injury to Plaintiff's thoracic spine, and only limited loss of curvature and disc bulges in her cervical spine. (R. 243–44.) Plaintiff was examined by two qualified physicians, Dr. Rubinfield and Dr.

Hoffman, neither of whom found any evidence of spinal injury beyond "some [neck] tenderness with mild muscle spasms." (R. 246–50; R. 342–45.) In short, there is no objective evidence in the record to substantiate Plaintiff's alleged physical disabilities.

The Magistrate Judge properly found that ALJ Cumming's findings on physical impairment were "not rebutted by evidence in the record from either chiropractor." (R. & R. 20.) Dr. Kaner and Dr. Matturo only treated Plaintiff for a period of nine months, and their treatment ended nearly five years prior to the second hearing on her claim of disability. Plaintiff's subsequent medical history is almost completely devoid of any evidence of the physical symptoms described by Dr. Kaner and Dr. Matturo. Although Plaintiff sought further treatment for her psychological problems, she obtained no further treatment for her alleged physical impairments. None of the eleven current medications listed in connection with her application for benefits were prescribed for pain relief or muscle spasms. (R. 155.)

The Court finds the cases cited by Plaintiff to be distinguishable. In two of these cases — Fields v. Shalah, 830 F.Supp. 284 (E.D.N.C. 1993) and Schonewolf v. Callahan, 972 F. Supp. 277 (D.N.J. 1997) — the chiropractic evidence of record was supported by objective medical findings. See Fields, 830 F. Supp. at 286 (both chiropractor and orthopedic surgeon agreed that claimant was impaired in ability to lift); Schonewolf, 972 F. Supp. at 285 ("[A]ny notion that this man can perform gainful employment is overwhelmed by medical evidence to the contrary."). In the present case, by contrast, the evidence from Plaintiff's chiropractors is unsubstantiated and sharply conflicts with the evidence from acceptable medical sources. The third case cited by Plaintiff, Carter v. Apfel, 220 F. Supp. 2d 393 (M.D. Pa. 2000), involved numerous errors by the ALJ, including a "failure to assign weight to Plaintiff's doctors' opinions and other substantial

omissions." Miles v. Astrue, No. 05-5892, 2007 WL 764037 (E.D. Pa. March 9, 2007). At least one court has refused to extend Carter to cases involving "a single and unsubstantial omission by the ALJ," id., and this Court will do the same. In any event, to the extent that Carter conflicts with Smith, the Court finds Carter to be unpersuasive and adopts Judge Morgan's reasoning in Smith.

For all of the foregoing reasons, the Court finds no error in ALJ Cummings' failure to specifically discuss evidence from Plaintiff's chiropractors. See Smith, 2010 WL 1640271 at *3; Shears, 2010 WL 3385518.

   2.    Dr. Lomazow's Opinion

Plaintiff claims that she "argued before this Court that the ALJ failed to assign evidentiary weight to Dr. Lomazow's opinion." (Pl.'s Br. 9.) According to Plaintiff, Dr. Lomazow's opinion is relevant to the assessment of her physical capacity to perform work. (Id.) Plaintiff contends that the Magistrate Judge failed to address her argument concerning Dr. Lomazow's opinion. (Id.) In rebuttal, Defendant argues that ALJ Cummings explicitly considered "the evidence summarized in the prior decision," including Dr. Lomazow's opinion. (Def.'s Br. 3.)

Plaintiff's argument rests on a distortion of the Magistrate Judge's findings. Plaintiff claims that "In his report, the Magistrate Judge states that 'Dr. Lomazow is an acceptable medical sources, and his opinions are discussed in detail in ALJ Costanzo's opinion.' (R&R at 21). However, that is the end of the Magistrate Judge's analysis in regard to Dr. Lomazow." (Pl.'s Br. 9.) In actuality, the Magistrate Judge's Report and Recommendation states as follows:

22

Shawn notes that a third provider, Steven M. Lomazow, M.D. a neurologist and psychiatrist, also treated her in New Jersey after the accident. As an M.D., Dr. Lomazow is an acceptable medical source, and his opinions are discussed in detail in ALJ Costanzo's opinion. However, as Dr. Lomazow's treatment summary states, his care of Shawn was limited to "post-traumatic headaches, . . . post-traumatic seizures [and] post-concussive symptomology" which the ALJ found to be severe impairments, and accomodated in his RFC assessment. (R. 282). With regard to her other physical limitations, Dr. Lomazow specifically stated that Shawn "was independently being treated for problems relating to the cervical and lumbar spine which I did not address." (R. 282).

(R & R. 21.)

Judge Miller rejected Plaintiff's argument "that the ALJ failed to assign evidentiary weight to Dr. Lomazow's opinion," because he found that Dr. Lomazow expressed no opinion concerning Plaintiff's cervical and lumbar spine problems. To suggest otherwise is to grossly misstate the Magistrate Judge's opinion. The Court perceives no error in the Magistrate Judge's analysis. As the Magistrate Judge correctly noted, Dr. Lomazow provided no relevant evidence concerning Plaintiff's physical ailments.

In any event, the Court agrees with Defendant that ALJ Cummings properly considered Dr. Lomazow's opinion and incorporated it by reference to ALJ Costanzo's prior opinion. ALJ Costanzo discussed Dr. Lomazow's opinion in considerable detail, and addressed all relevant evidence contained therein. (R. 67.) An ALJ may—as ALJ Cummings did here—incorporate by reference an earlier decision evaluating the evidence. See, e.g., Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir.2001) ("Although [ALJ] Kelly did not specifically address Dr. Dawson's opinion, she incorporated by reference ALJ Bernoski's discussions of the medical evidence[,]" which was supported by substantial evidence.); Banks v. Barnhart, 434 F.Supp.2d 800, 805 n. 10 (C.D.Cal.2006) ("The ALJ made no Step Three finding on remand, but he incorporated by

reference his earlier opinion in which he found plaintiff's condition does not meet or equal a listed impairment."). The Court perceives no error in the analysis of ALJ Cummings or ALJ Costanzo.

## III. CONCLUSION

For the reasons set forth above, the Court hereby **DENIES** the Defendant's Objections to the Report and Recommendation of the Magistrate Judge. The Court **ADOPTS** the Report and Recommendation of Magistrate Judge Douglas Miller, and incorporates it by reference. Thus, the final decision of the Commissioner is hereby **AFFIRMED**.

The Clerk of the Court is **DIRECTED** to mail a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

Robert G. Doumar
Senior United States District Judge

November __l__, 2010

Norfolk, Virginia